**In re STIX & CO., INC., Debtor.**

**Harry O. MOLINE, Trustee, Plaintiff,**

**v.**

**Thomas R. BRIMBERRY, Defendant.**

**Adv. No. 82–0120(1).**
**Bankruptcy No. 81–02591(1).**

United States Bankruptcy Court,
E.D. Missouri, E.D.

Jan. 14, 1983.

---

Harry O. Moline, Clayton, Mo., pro se.

Ronald D. Stanley, Belleville, Ill., for defendant.

## MEMORANDUM OPINION

ROBERT E. BRAUER, Bankruptcy Judge.

By a Complaint filed on February 23, 1982, Harry O. Moline, Trustee (Moline), seeks an order (1) compelling Defendant Brimberry (Brimberry) to account for all funds allegedly diverted since 1975 from Stix & Co., Inc., Debtor (Stix), and to account for the disposition of those funds; (2) impressing a trust upon bank accounts and real estate, held by Brimberry, which were established or purchased with funds and/or securities allegedly wrongfully diverted from Stix; and (3) directing Brimberry to turn over to him (Moline) all "assets in his custody or control belonging to Stix or which were purchased with funds diverted from Stix". By an Amendment to the Complaint, filed October 4, 1982,[1] Moline seeks, also, an award of money damages, together with "such other and further relief that may be just and appropriate".[2]

In the Complaint, as amended, Moline alleges that Brimberry (an officer, director and shareholder of Stix, and who served as chief operations officer and who supervised the operations function of Stix) and others developed and implemented a scheme pursuant to which he (Brimberry) wrongfully diverted cash and/or securities, totalling approximately $14,000,000, from Stix, through the establishment of controlled margin accounts which were posted to reflect fictitious security positions from which funds were wrongfully withdrawn for the benefit of Brimberry and others; that Brimberry, through his capacity as Chief Operations Officer and director, caused Stix' records to be falsified to conceal the scheme and facilitate the wrongful withdrawals; that the fictitious securities positions reflected by the controlled margin accounts reflected securities having a market value of $36,238,625, which securities have not been located; that the cash and securities wrongfully withdrawn and diverted from Stix, by Brimberry, were used by him to purchase real estate, and personal property, and bank accounts, now in his name and/or under his control; that such property is property of the estate within the meaning 11 U.S.C. 541, subject to turn over order under 11 U.S.C. 542.

On August 13, 1982, a consent order was entered by this Court (upon Moline's Motion For Injunction), enjoining Brimberry and those in concert with him from disposing of any real property in which he, or his wife, or his minor children, have any legal or beneficial interest, until all claims asserted in this Cause are finally determined. On the same day, Brimberry filed a Report with this Court, by which he agreed that he and/or his wife would convey to Moline various parcels of real estate, and a Jet Boat.[3] Specifically excepted from the

---

1. Defendant's Answer was filed April 14, 1982. Leave to file the Amendment was not sought, but is being granted hereby. See Rule 15, F.R. C.P., Bankruptcy Rule 715.

2. The measure of relief, contained in the italicized portion of the sentence, was requested in the original Complaint, also.

3. 9 Lots in the Sixth Addition To Town & Country East, Madison County, Illinois; Outlot A of Eighth Montclaire, in Edwardsville, Illinois; Lots 1 and 3, at Hwy 162 and Mockingbird Lane, Madison County, Illinois; 10 acres in

agreement, contained in the Report, is certain real estate, not therein identified by location, as to which the Trustee was laying claim, the claim being resisted by Brimberry. The real estate is known as 6100 Huntress Drive, Paradise Valley, Arizona, held in trust by Stone, Menkes and Carrion, Ronald Stone, Trustee, under a revocable Trust Agreement dated April 22, 1980, wherein Brimberry, using an alias or pseudonym, Tom Miller, is the Trustor.

The only issues remaining in the case, following the filing of the Report, are (1) whether Moline is entitled, under the proof, to a judgment against Brimberry, and (2) whether a trust, in favor of Moline, is to be impressed upon the Paradise Valley real estate, and that real estate ordered to be transferred to Moline as property of this estate.

.    .    .    .    .

The Matters in issue were submitted, by Stipulation filed September 22, 1982, upon the deposition of one Ronald Stone, and upon certain portions of a transcript of testimony given by Brimberry on November 10, 1981, in the St. Louis, MO FBI Offices to certain officers of various Federal agencies.

### INDEBTEDNESS

The Trustee's evidence consists of Debtor's records (Exhibits 1 through 11), identi-

Chouteau Township, Illinois; 21 acres on Mockingbird Lane, in Granite City, Illinois; Acreage in Edwardsville Township, Illinois; and a Jet Boat, located at Lake Ozark, Mo.

4. The J.A. Miller account, No. 11641081; the Arthur Miller, Jr., account, No. 11641146; the J.A.M. account, No. 11391808; the Miller, Inc., account, No. 11642169; the Rimco account, No. 11753424; the Zram Enterprises account, No. 11998532, the Jerry S. Maeras account, No. 11590851; and the Maeras Enterprises account, No. 11590819, were controlled absolutely by Brimberry. The James Massa TTEE U/T DTD 7/16/79 For James Massa, account No. 11606146, and the James Massa TTEE U/T DTD 7/16/79 For James Massa and Gerry Massa, account, No. 11606162, were manipulated by Brimberry, under Massa's control and general direction, to reflect fictitious security positions.

fied by Brimberry in his transcript testimony, as records (Statements of Account) evidencing the security positions, bona fide and fictitious, and short positions, in 10 margin accounts maintained with the Debtor. Each of these 10 accounts was either controlled absolutely by Brimberry, or was manipulated by him with the consent of the entity in whose name(s) the account was maintained.[4]

The records speak as of October 31, 1981. No other evidence was adduced. To the extent that each of the ten accounts includes legitimate security positions, credit for the value of which must be given to establish an indebtedness, the amount of the judgment being recommended takes into account the values ascribed to those legitimate securities positions as of October 31, 1981.

According to my analysis of the records (Statement Of Accounts), Moline is entitled to judgment against Brimberry in and for the sum of $23,477,940.37,[5] and I so recommend that a judgment for that sum be entered.

In computing the amount for which the judgment is being recommended, each Statement of Account has been analyzed. Analysis of the J.A. Miller account, No. 11641081, is herein set forth. Analyses of the remaining nine accounts is attached hereto by Exhibits.[6]

5. The amount of the judgment includes the debit, or indebtedness, positions of the two Massa accounts, as Brimberry testified that though Massa controlled the accounts, he (Brimberry) was given the discretion (by Massa), and utilized it, to determine which fictitious securities were to be posted to the accounts to reflect a bona fide security position, and posted the fictitious securities positions to the accounts.

6. The J.A. Miller account is being used because it appears to be the first account utilized by Brimberry in furtherance of his scheme to defraud Stix. Brimberry refers to this account as the "mother account", in his testimony, and to the other seven accounts, which he controlled absolutely, as satellite accounts. The name "J.A. Miller" is actually the maiden name of his wife. The name was used so that other officers and directors of Stix could not determine that he (Brimberry) controlled the account. It was

The Statement of Account, relating to this account, reflects a debit, or indebtedness, balance to Stix, of $3,895,756.39, secured by securities positions, of which $1,067,842.50 is the total value of legitimate securities positions,[7] in contrast to $5,067,750.00 as the value of fictitious securities positions. The securities positions, reflected in the account, are:

| | | | PHONY (VALUE) | LEGIT. (VALUE)[8] |
|---|---|---|---|---|
| 20,000 Sh. | TOM BROWN | | 565,000 | |
| 30,000 Sh. | BURTON HAWKS | | | 121,890.00 |
| 5,000 Sh. | CHAPARRAL RES. INC. | | | 43,750.00 |
| 13,100 Sh. | CITIES SERVICE | | | 638,625.00 |
| 5,000 Sh. | COLONIAL COMMERCIAL | | | 3,750.00 |
| 30,000 Sh. | COMDIAL CORP. | | | 170,640.00 |
| 2,500 Sh. | FIRST MISS. CORP. | | | 35,937.50 |
| 36,000 Sh. | RAYCHEM CORP. | | 1,782,000.00 | |
| 10,000 Sh. | SCRIPPS HOWARD | | 202,500.00 | |
| 20,000 Sh. | SIGMA ALDRICH CORP. | | 1,185,000.00 | |
| 10,000 Sh. | TANDEM COMPUTERS, INC. | | 326,250.00 | |
| 12,000 Sh. | TEKTRONIX, INC. | | 612,000.00 | |
| 20,000 Sh. | VALMONT INDUSTRIES | | 395,000.00 | |
| 6,000 Sh. | VICTORIA STATION, INC. | | | 53,250.00 |
| 17,750 Sh. | HOLIDAY INNS CONV. | | | N/A |

Accordingly, as to this account a debt of $2,827,913.89 is owed Stix.

Brimberry does not question, in his transcript testimony, the authenticity or veracity of the Statements of Accounts as evidentially reflective of the debit balances in the ten margin accounts, nor as evidence of the indebtedness to Stix in respect of those accounts. His only testamentary protest in respect of those Statements is that the debit balances, the indebtedness, does not necessarily reflect the amount of monies he improperly diverted from Stix, explaining that the debit balance includes interest, over the years, on the margin accounts loans and losses sustained in respect of

trades in legitimate securities transactions for the accounts. The Statements of Account are to be accepted, and I so recommend, as substantive evidence of Brimberry's indebtedness to Stix in respect of activity in the eight margin accounts he absolutely controlled, and as evidence of the amount of damages sustained by Stix by reason of Brimberry's active participation in the fraudulent manipulation of the securities positions in the two Massa accounts.

## CONSTRUCTIVE TRUST

Moline contends that a constructive trust is to be imposed upon the Paradise Valley real estate, because it was acquired by

this account from which Brimberry effected his principal withdrawals.

7. 17,750 shares of Holiday Inns Conv., reflected in this account, is a legitimate securities position, also, but the Statement of Account does not value this position, and the evidence does not otherwise reflect the value of this position.

Similarly, the Stix records reflect this account is "long" on 20,000 shares of Tom Brown, and 30,000 shares "short" on Digital

Equipment Corp. stock, but the evidence does not reflect how these positions may increase, or decrease, the amount of Brimberry's indebtedness to Stix.

8. The Statement of Account does not presume to denote which security positions are or are not legitimate. The "phony" and "legitimate" appellations are mine, based on Brimberry's testimony.

Brimberry, in final analysis, with funds improperly diverted from Stix, even if the real estate was acquired by Brimberry with gambling winnings. Brimberry argues to the contrary, arguing that the real estate was acquired with (Las Vegas) gambling winnings, winnings had at a time when Brimberry had established "gambling credit", at Las Vegas casinos, and when misappropriated monies, from Stix, were not being used by Brimberry to subsidize his gambling when those winnings occurred. Brimberry's argument is that though his prolific gambling, in Las Vegas, and his huge gambling losses there, always paid by improper diversions of money from Stix, enabled him to establish "gambling credit" in the Las Vegas casinos, he bought the real estate with winnings from gambling which occurred at a time (times) when the credit had been established, when Stix money was not being used directly to subsidize the gambling (during which the winnings occurred), so that (it is argued) the proceeds of the winnings are his to keep, and any property acquired with those proceeds is immune to a recovery by Moline or to the imposition of a constructive trust.

Neither party has articulated his position in a brief or memorandum of law. Each contention was made, upon oral argument, upon final submission of the controversy.

It is my judgment that Moline's contention be sustained, and I so recommend, recommending that a constructive trust be imposed and impressed upon the Paradise Valley real estate.

1. Brimberry's premise—that the real estate was purchased with gambling winnings at a time (or, times) when his gambling was being done on "gambling credit" earlier established, and not directly subsidized with moneys improperly diverted from Stix, is *not* supported by the evidence upon which this controversy was submitted.[9]

Brimberry testified that the J.A. Miller account (referred to, supra) was principally the account through which he made his unlawful withdrawals from Stix; that cash money was taken from the J.A. Miller account to cover gambling losses. He testified

Q  "How was money transmitted for the purpose of gambling?

A  "I would have a check sent over to the Madison Bank.[10]

Q  "Was that a Stix check?

A  "A Stix check. I would get a money order from the Madison Bank, payable to MGM Grand or the Desert Inn, take it out and deposit it with their cage and gamble the money until it was gone or whatever."[11]

He further testified:

Q  "Did money from the J.A. Miller account in any way go to purchase

---

9.  The evidence (as stated earlier, at page 254) consists of the transcript of a Statement given on November 10, 1981, by Brimberry to Federal law enforcement authorities. Moline did *not* participate in eliciting the statement. Brimberry's bankruptcy counsel was present during the taking of the statement. This adversary cause had *not* been filed. Though inquiry was made of the manner in which Brimberry disposed of the monies taken from Stix, and revealed that a portion of it was used to buy real estate properties, searching inquiry was not made concerning any particular parcel, nor of the particular funds used to buy any particular parcel, nor how those funds were acquired.

The only other evidence in this record is the deposition testimony of one Ronald Stone, an attorney at law practicing in Southern California, who handled the real estate closing for Brimberry. Stone's testimony is substantively meaningless in respect of the source of funds used by Brimberry to acquire the Paradise Valley real estate.

10.  Earlier, he testified that he would have a Stix check drawn payable to the First National Bank of Madison (Madison, Illinois), for the account of J.A. Miller, and deposited there in the J.A. Miller account.

11.  Brimberry's first trip to Las Vegas, subsidized by his own personal financial resources, was made in 1975. He "really didn't get started going to Vegas" until his association in 1977 with Massa, "and it steadily streamlined" since then, to the point where he was making 20 to 30 trips there a year, trips of a day, or two, or three, always on weekends, so that he was able to appear at the Stix offices on work-days, so that his presence would lessen the chance of the discovery of his scheme.

real estate for your direct or indirect personal benefit?

A "I would have to answer yes.

After testifying that his house on Bluebird Lane in Granite City (Illinois) was not acquired with Stix funds, he continued:

A "Any other property that I would have acquired other than a couple of pieces of property that I won winnings on in Las Vegas to purchase, everything else one way or another, the money had to come from Stix & Co.

· · · · ·

Q "Do you also own property in Phoenix, Arizona?

A "It's in trust for my children, and that was gambling money that I had taken and purchased that house.

Q "You say 'in trust', what do you mean by that?

A "My wife had the thing done. I was gambling every nickel away that came along. That's—If my records were pulled in Vegas, they would show millions and millions of dollars that I gambled away on my card out there. Every nickel that came along I was gambling away, so she took money and made a down payment for purchase on this home in Phoenix, four hundred some thousand dollars.

It's not like the home, the million—almost two million dollar home I have in Illinois, and had a trust situation worked out for the children for that house."

The Paradise Valley real estate was purchased for cash. Brimberry's closing agent received the first portion of the cash purchase price from the charter manager of the MGM Grand Hotel, in Las Vegas, the sum of $105,000.00, delivered to him in a brown tote bag. The cash consisted of $100 bills, wrapped in packets of $5,000 each. Later, the agent received $133,000, in cashier's checks, or money orders, at his Southern California law office, from a courier.[12] Still later, on the day of closing, the agent received a Cashier's Check, dated May 7, 1980, payable to his order, for $245,000.00, issued by the Fairview Heights Community Bank, Fairview Heights, Illinois.

No other evidence appears in the record made in this cause in respect of the money, and the source thereof, used to purchase the Paradise Valley real estate. The evidence, and reasonable inferences drawn therefrom does *not* support, in my judgment, the Brimberry premise. It does *not* support a finding that there was a time, or a number of times, when Brimberry went to Las Vegas, to gamble upon gambling credit he earlier established by his prolific gambling activity (and tremendous losses therefrom—paid by Stix money), and won, and used *those* winnings to buy the real estate. More appropriately, in my judgment, Brimberry's testimony supports the inference that when he gambled (and won) he gambled upon the strength and security of Stix money reposing in the casino cage, brought with him from St. Louis to cover anticipated losses.

2. Moreover, even if the evidence were sufficient to sustain the Brimberry premise, his conclusion, argued for, does not follow.

Brimberry's testimony clearly shows that his prolific gambling activity in Las Vegas was subsidized by Stix money, by money he knowingly and unlawfully[13] diverted from

12. These checks are in evidence as deposition exhibits to the deposition of Stone (footnote 9, supra). Most are for $9,000. None is for a sum in excess of $9,000 so far as I am able to discern. Some of the exhibits are not legible.
   The evidence is silent as to why the checks are for $9,000, or less.

13. Brimberry's fraudulent scheme was relatively simple. From time to time he established the eight margin accounts which he absolutely controlled. Bogus, or phony, security positions in those accounts, to permit the withdrawal of money from the purported equity positions reflected therein, were posted and credited by the simple expedient of Brimberry's going to a computer terminal and punching the appropriate keys to reflect (and record in the computer) the purchase or acquisition of securities for the account(s) when such securities had not been purchased or acquired. Appropriate in-house documents were then prepared by him to "document" the phoney transactions. At times, when an audit was anticipated, Brimberry would prepare stock certificates, on forms he acquired, and deposit those bogus certificates

Stix, and that his gambling losses of "millions and millions" of dollars were paid by that Stix money. The payment of these losses, it's fair to say, permitted Brimberry to establish his gambling credit. If, then, he won when he was gambling on his established gambling credit (rather than on the strength of a bank check which he had taken to the cage of the casino to cover anticipated losses), he won only because his anticipated unlawful diversion of Stix money, in the event of a gambling loss, permitted the gamble initially. This Court, a court of equity, must view Brimberry's gambling activity, in the circumstances of this case, in its entirety. It has to be blind to those isolated instances when Brimberry may have won even though he was gambling on his own credit. As Moline says, Brimberry cannot be permitted, in the circumstances of this case, to claim that the losses are Stix', but that the winnings are his.

Whether or not Brimberry won, while gambling on his gambling credit, or at a time when he and the casino basked in the comfort of a stake provided to the casino cage by a check purchased with Stix money, the rule of Section 202 of the Restatement of Restitution applies. The rule is that

Where a person wrongfully disposes of property of another knowing that the disposition is wrongful and acquires in exchange other property, the other is entitled at his option to enforce either

(a) a constructive trust of the property so acquired, or

(b) an equitable lien upon it to secure his claim for reimbursement from the wrongdoer.

Comment b to Section 202 states that the rule is applicable where the wrongdoer is a

fiduciary. Section 190 of the Restatement describes officers of a corporation as a fiduciary. Here, all throughout the period of the scheme, and of Brimberry's gambling activity, he was a Stix employee. In 1979 he became its Senior Vice President. In respect of his unlawful diversions, at all times during the existence of the scheme, he was a fiduciary within the meaning of the rule.

Comment c to the Section (202) states that where a person by the conscious wrongful disposition of the property of another acquires other property, the person whose property is so used is not only entitled to hold the wrongdoer personally liable for the value of the property wrongfully disposed of, he is entitled as an alternative to the property so acquired, the wrongdoer holding the property so acquired upon a constructive trust and subject to being compelled in equity to convey it to the person wronged. Comment c recognizes, also, that the person wronged is entitled to any profit the wrongdoer realizes upon the transaction by which he consciously disposes of property of another wrongfully acquired.

Comment 1 to the Section states that the rule is applicable, also, where one person by wrongful disposition of the property of another acquired other property in exchange, even though the transaction by which it is disposed of is illegal, and that, in such a case if a profit is realized, the person wronged is entitled to reach it. Illustrating the rule, the commentators say that "Thus, where one person wrongfully uses the money of another in illegal gambling[14] or in conducting an illegal business, and makes a profit thereby, the person whose money is so used is entitled to reach the profit". (footnote supplied).

.     .     .     .     .

---

*in appropriate places until the audit was completed.*

*The two Massa accounts were similarly deceptively manipulated.*

*The eight margin accounts, absolutely controlled by him, were maintained in names which masked the identity of he who controlled the accounts, names of family member, associates, or of entities not actively engaged in any legitimate business enterprise.*

**14.** *Gambling is legal in Nevada. Even so, Comment c, previously referred to, permits the wrongdoer to recover the "profit" of the transaction where the transaction, by which wrongfully acquired property is disposed of by the wrongdoer, is legal. The obvious purpose of the rule—which allows the person wronged to recover the "profit"—is to emphatically discourage wrongdoing.*

■ To impose a constructive trust, the person wronged, must be able to trace the property, consciously and wrongfully acquired, into property in respect of which the constructive trust is sought to be impressed. The burden of proof in this respect is upon Moline. Section 215, Restatement of Trusts.

Unquestionably, the evidence clearly is that the Paradise Valley real estate was acquired, for cash, by Ronald Stone, as agent for Brimberry, and that the cash came from Brimberry's gambling winnings. Under the Restatement rules, Moline is entitled to impress a constructive trust upon the real estate.

.　　.　　.　　.　　.

Title to the real estate was taken, by Warranty Deed, which describes "Ronald Stone, as Trustee of the Trust dated April 12, 1980", as the grantee. Stone, Brimberry's closing agent, took title in that fashion at the discretion of Brimberry.[15]

By the Trust Agreement, Brimberry "transfers and assigns" the real estate "to Stone, Menkes And Carreon, Ronald Stone, the Trustee". Stone has signed the Trust Agreement as Trustee.

The trust, created by the Trust Agreement, is revocable. Paragraph Thirteenth thereof recites that "The Trustor may revoke all or any part of the property held in trust and may amend this agreement by a written instrument delivered to the Trustee. . ." etc.

■ Accordingly, it is my judgment that Moline is entitled to impress a constructive trust upon the real estate, and I so recommend that a judgment be entered impressing such a trust upon the real estate. The judgment to impress and to enforce the trust, and I so recommend, should require Brimberry, as Tom Miller, to revoke the trust of the Trust Agreement and direct the Trustee(s) thereof to convey the real estate, by appropriate conveyance instrument, to Harry O. Moline, Trustee, of Stix & Co., Inc., and to provide that if Brimberry refuses so to do, upon the entry of the judgment, that Moline, in his stead, be empowered to revoke the Trust Agreement and direct the Trustee(s) thereof to convey the real estate to him in his trust capacity as Trustee of this case.

.　　.　　.　　.　　.

The real estate is located in Maricopa County, Arizona, and is legally described as

Lot 2, FINISTERRE, according to Book 196 of Maps, page 16, records of Maricopa County, Arizona.

.　　.　　.　　.　　.

This Memorandum Opinion (or, a certified copy thereof) is being transmitted to the United States District Court for this District as this Bankruptcy Judge's recommended findings of fact and conclusions of law, in accordance with the provisions of paragraph (d)(3)(A) of the Rule For The Administration Of the Bankruptcy System In The Eastern District Of Missouri, promulgated December 20, 1982, effective December 25, 1982. The Judgment proposed, and transmitted herewith, is proposed and transmitted, also, pursuant to such provisions.

---

15. At the time, Brimberry was using an alias "Tom Miller", and was known by Stone only as Tom Miller. The Trust Agreement of April 22, 1980, describes Tom Miller as the Trustor. Brimberry, the Defendant in this Adversary Cause, is Tom Miller, the Trustor.

## COURT EXHIBIT 1

**ARTHUR MILLER, JR.**        Account 11641146

Debit Position      October 31, 1981        $3,495,534.74

| Security Positions | PHONY (Value) | Legit. (Value) | |
|---|---|---|---|
| 40,000 Sh. TOM BROWN, INC. | $1,130,000.00 | | |
| 10,000 Sh. CITIES SERVICE CO. | | $487,000.00 | |
| 3,000 Sh. COLONIAL COMMERCIAL | | 2,250.00 | |
| 29,500 Sh. COMDIAL CORP. | | 167,796.00 | |
| 625 Wrnts. DAMSON OIL | | 3,437.50 | |
| 12,500 Sh. DUNES HOTEL | | 298,437.50 | |
| 40,000 Sh. ENZO BIOCHEM, INC. | | 650,000.00 | |
| 2,800 Sh. INTERCITY GAS CORP. | | 24,850.00 | |
| 10,000 Sh. SCRIPPS HOWARD | 202,500.00 | | |
| 35,000 Sh. TAMDEM COMPUTERS | 1,141,875.00 | | |
| 40,000 Sh. VALMONT INDUST. | 790,000.00 | | |
| 20,000 Sh. WASTE MGT., INC. | 725,000.00 | | |
| Total Value Security Positions | | $5,623,146.00 | * |
| Total Value Phony " " | | 3,989,375.00 | |
| " " Legitimate Security Positions | | 1,633,771.00 | |
| Short Positions (Debt) | | 48,591.29 | 1,585,179.71 |
| Net Indebtedness | | | $1,910,355.03 |

* Exhibit 1 to the Brimberry deposition reflects the total value of the security positions to be $5,623,646.00. So far as can be determined, a mathematical error of $500 has been made on the Exhibit.

**J.A.M.**      Account 11391808

Debit Position,      October 31, 1981        $3,493,126.40

| Security Positions | Phony (Value) | Legit. (Value) | |
|---|---|---|---|
| 30,000 Sh. BURTON HAWKS, INC. | | 121,890.00 | |
| 10,000 Sh. DAMSON OIL | | 112,500.00 | |
| 625 Wrts. DAMSON OIL | | 3,437,50 | |
| 10,000 Sh. GENERAL RE CORP. | 771,250.00 | | |
| 2,300 Sh. KING INT'L CORP. | | 2,444.90 | |
| 8,000 Sh. RECOGNITION EQUIP. | | 57,000.00 | |
| 30,000 Sh. TAMDEM COMPUTERS, INC. | 978,750.00 | | |
| 40,000 Sh. TECUMSEH PROP. CO. | 2,340,000.00 | | |
| 40,000 Sh. VALMONT INDUSTRIES | 790,000.00 | | |
| 20,000 Sh. WASTE MGMT. INC. | 725,000.00 | | |
| Total Value Security Positions | | 5,902,272.40 | |
| " " Phony Security Positions | | 5,605,000.00 | |
| " " Ligit. " " | | 297,272.40 | |
| Short Positions | | 58,296.39 | |
| | | 238,976.01 | |
| | | | 238,976.01 |
| Net Indebtedness | | | $3,254,150.39 |

## MILLER, INC.  Account 11642169

| Debit Position, | October 31, 1981 | | 3,400,469.70 |
|---|---|---|---|
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 10,000 Sh. TOM BROWN, INC. | 1,130,000.00 | | |
| 87,700 Sh. BURTON HAWKS | | 356,325.10 | |
| 30,000 Sh. COMMERCIAL CORP. | | 170,640.00 | |
| 10,000 Sh. DAMSON OIL | | 112,500.00 | |
| 625 Wrts. DAMSON OIL | | 3,437.50 | |
| 12,500 Sh. DUNES HOTEL | | 298,437.50 | |
| 10,000 Sh. ENZO BIOCHEM, INC. | | 162,500.00 | |
| 10,000 Sh. SCRIPPS HOWARD | 202,500.00 | | |
| 30,000 Sh. SIGMA ALDRIDGE | 1,777,500.00 | | |
| 12,000 Sh. TEKTRONIX, INC. | 612,000.00 | | |
| 20,000 Sh. VALMONT INDS. | 395,000.00 | | |
| Total Value  Security Positions | | 5,220,840.10 | |
| "  "  Phony Security Positions | | 4,117,000.00 | |
| "  "  Legit.  "  " | | 1,103,840.10 | |
| Short Positions | | 267,222.50 | |
| | | 836,617.60 | 836,617.60 |
| Net Indebtedness | | | 2,563,852.10 |

## RIMCO  Account 11753424

| Debit Position, | October 31, 1981 | | $3,044,517.74 |
|---|---|---|---|
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 5,000 Sh. ANGELICA CORP. | | 103,125.00 | |
| 10,000 Sh. BURTON HAWKS | | 40,630.00 | |
| 20,000 Sh. GENERAL RE CORP. | 1,542,500.00 | | |
| 10,000 Sh. SCRIPPS HOWARD | 202,500.00 | | |
| 900 Sh. KING INT'L | | | |
| 10,300 Sh. SEMTECH CORP. | | 42,487.50 | |
| 10,000 Sh. SIGMA ALDRICH | 592,500.00 | | |
| 30,000 Sh. TECUMSEH PROP. | 1,755,000.00 | | |
| 12,000 Sh. TEKTRONIX | 612,000.00 | | |
| 5,000 Sh. VICTORIA STATION | | 44,375.00 | |
| Total Value Security Positions | | 4,935,117.50 | |
| "  "  Phony Security Positions | | 4,704,500.00 | |
| "  "  Legit.  "  " | | 230,617.50 | |
| Short Positions | | 51,679.89 | |
| | | 178,937.61 | |
| | | | 178,937.61 |
| Net Indebtedness | | | 2,865,580.13 |

| ZRAM ENTERPRISES | Account 11998532 | | |
|---|---|---|---|
| Debit Position, | October 31, 1981 | | $3,115,020.41 |
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 25,000 Sh. GENERAL RE CORP. | 1,928.125.00 | | |
| 2,300 Sh. KING INT'L CORP. | | 2,444.90 | |
| PUBLICATIONS IND. | | 24.50 | |
| 10,000 Sh. SCRIPPS HOWARD | 202,500.00 | | |
| 10,300 Sh. SEMTECH CORP. | | 42,487.50 | |
| 10,000 Sh. SIGMA ALDRIGE | 592,500.00 | | |
| 20,000 Sh. TANDEM COMPUTERS | 652,500.00 | | |
| 10,000 Sh. TEKTRONIX | 510,000.00 | | |
| 30,000 Sh. WASTE MGMT. | 1,087,500.00 | | |
| 17,750 Sh. HOLIDAY INNS CONV. | | N/A | |
| Total Value   Securities Positions | | 5,018.081.90 | |
| "      "      Phony Securities Positions | | 4,973,125.00 | |
| "      "      Legit.    "          " | | 44,956.90 | |
| Short Portions | | 110,582.89 | |
| | | 65,625.99 | ( + )  65,625.99 |
| Net Indebtedness | | | 3,180,646.40 |

| Jerry S. Maeras | Account 11590851 | | |
|---|---|---|---|
| Debit Position, | October 31, 1981 | | 2,400,464.77 |
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 4,000 Sh.   ANIXTER BROS. | | 61,000.00 | |
| 10,000 Sh.   CITIES SERVICE | | 487,500.00 | |
| 1,000 Sh.   COLONIAL CMRCL. | | 750.00 | |
| 10,000 Sh.   DAMSON OIL | | 112,500.00 | |
| 625 Wrts.   DAMSON OIL | | 3,437.50 | |
| 5,000 Sh.   GENERAL RE CORP. | 385,625.00 | | |
| 4,400 Sh.   MAMITONOC CO. | | 126,500.00 | |
| 20,000 Sh.   RAYCHEM CORP. | 990,000.00 | | |
| 20,000 Sh.   TANDEM COMPUTERS | 652,500.00 | | |
| 1,000 Sh.   TOSCO CORP. | | 21,125.00 | |
| 72 Sh.   UNITED IND. | | 2,277.00 | |
| 5,000 Sh.   VICTORIA STATIONS | | 44,375.00 | |
| 20,000 Sh.   WASTE MGMT. | 725,000.00 | | |
| Total Value Securities Positions | | 3,612,589.50 | |
| "      "      Phony Securities Positions | | 2,753,125.00 | |
| "      "      Legit.    "          " | | 859,464.50 | 859,464.50 |
| Net Indebtedness | | | 1,541,000.27 |

**MAERAS ENTERPRISES**  Account 11590819

| Debit Position, | October 31, 1981 | | 2,187,973.39 |
|---|---|---|---|
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 4,000 Sh. ANIXTER BROS. | | 61,000.00 | |
| 4,000 Sh. COLONIAL CMRCL. | | 3,000.00 | |
| 10,000 Sh. DAMSON OIL | | 112,500.00 | |
| 650 Wrts. DAMSON OIL | | 3,437.50 | |
| 5,000 Sh. FIRST MISS. CORP. | | 71,875.00 | |
| 10,000 Sh. GENERAL RE CORP. | 771,250.00 | | |
| 5,000 Sh. KING INT'L CORP. | | 5,315.00 | |
| 15,000 Sh. SIGMA ALDRICH | 888,750.00 | | |
| 10,000 Sh. TEKTRONIX, INC. | 510,000.00 | | |
| 48 Sh. UNITED INDSTRL. | | 1,518.00 | |
| 20,000 Sh. VALMONT IND. | 395,000.00 | | |
| 20,000 Sh. VICTORIA STA. INC. | | 177,500.00 | |
| 20,000 Sh. WASTE MGMT. | 725,000.00 | | |
| Total Value Securities Positions | | 3,726,145.50 | |
| " " Phony Securities Positions | | 3,290,000.00 | |
| " " Legit. " " | | 436,145.50 | 436,145.50 |
| Net Indebtedness | | | 1,751,827.89 |

**JAMES MASSA TTEE**  Account 11606146

| Debit Position, | October 31, 1981 | | 3,820,011.75 |
|---|---|---|---|
| Securities Positions | Phony (Value) | Legit. (Value) | |
| 50,000 Sh. CHAPARRAL RES. | | 443,625.00 | |
| 25,000 Sh. CITIES SERVICE | | 1,218,750.00 | |
| 5,000 Sh. FIRST CHARTER FNCL. | | 60,000.00 | |
| 5,000 Sh. KING INT'L | | 5,315.00 | |
| 212 Sh. PUBLISHERS INDUSTRIES | | 742.00 | |
| 30,000 Sh. RAYCHEM CORP. | 1,485,000.00 | | |
| 10,000 Sh. SCRIPPS HOWARD | 202,500.00 | | |
| 10,000 Sh. TECUMSEH PROD. | 585,000.00 | | |
| 20,000 Sh. TEKTRONIX INC. | 1,020,000.00 | | |
| 40,000 Sh. VALMONT IND. | 790,000.00 | | |
| Total Value Securities Positions | | 5,810,932.00 | |
| " " Phony Securities Positions | | 4,082,500.00 | |
| " " Legit. " " | | 1,728,432.00 | 1,728,432.00 |
| Net Debit Balance * | | | 2,091,579.75 |

This account reflects Short Positions. The evidence, however, does *not* reflect that Brimberry should be held responsible for the Short Positions.

JAMES MASSA TTEE for JAS. & GERRY MASSA    Account 11606162

| | | | | Phony (Value) | Legit. (Value) | |
|---|---|---|---|---|---|---|
| Debit Position, | | October 31, 1981 | | | | 2,016,281.02 |
| Securities Positions | | | | Phony (Value) | Legit. (Value) | |
| 45,000 Sh. | BURTON HAWKS | | | | 182,835.00 | |
| 10,000 Sh. | CHAPARAL RES. | | | | 87,500.00 | |
| 5,000 Sh. | CITIES SERVICE | | | | 243,750.00 | |
| 10,500 Sh. | KING INT'L CORP. | | | | 11,161.50 | |
| 10,000 Sh. | RAYCHEM CORP. | | | 495,000.00 | | |
| 10,000 Sh. | SCRIPPS HOWARD | | | 202,500.00 | | |
| 10,000 Sh. | TANDEM COMPUTERS | | | 326,250.00 | | |
| 10,000 Sh. | TECUMSEH PROD. | | | 585,000.00 | | |
| 20,000 Sh. | TEKTRONIX INC. | | | 1,020,000.00 | | |
| 20,000 Sh. | VALMONT IND. | | | 395,000.00 | | |
| Total Value Securities Positions | | | | | 3,548,996.50 | |
| " " Phony Securities Positions | | | | | 3,023,750.00 | |
| " " Legit. " " | | | | | 525,246.50 | 525,246.50 |
| Net Indebtedness | | | | | | 1,491,034.52 |